Charles Burke for the appellant Beachmart. With me here this morning is Mr. Israel Golassa, who is the man that built Beachmart from those children who help him in that business. As the Court knows, Beachmart operates Super Wings stores in the Outer Banks, L&L Wings operates Wings stores. In this case, at its essence, every claim in this case at its core is a dispute over the ownership or the right to use that Wings trademark. The really amazing thing is the fact that district court found a way to adjudicate this case to dismiss the claims without dealing with the core issue. The district court was able to dismiss by dealing with collateral issues, but nowhere did the court rule who owns the Wings trademark either today or any day. Nowhere did the court ever consider my client's claims to ownership or my client's claims to use the trademark. The pivotal event that led us to get that ruling was a pretrial conference that we were in last February before Judge Boyle. At that point, this case was seven years old, we'd had four discovery periods, we'd filed three sets of summary judgment motions, we'd had dozens of depositions. Was this the first appearance in front of Judge Boyle after Judge Boyle? It was our second appearance before him, Your Honor, and we had had three separate trial dates. My client has been at a lot of courtrooms trying to get a trial in this case, and unfortunately it immediately became apparent at that pretrial conference that we weren't getting a trial this time either. We ended up arguing summary judgment motions, but we did it in a way that I've never done in my 28-year legal career, because we didn't argue the merits. Because Judge Boyle made it clear that he had this commitment to finality, that he was going to find a way to dismiss the case, and what he told us is he wanted to know whose motion would dispose of the case fully. That's the motion he was looking to grant it, and so counsel and I argued not the merits, but which motion would end and result in the dismissal of all claims. And that was an argument that I was bound to lose. I was bound to lose because, number one, I had already moved for summary judgment as to the Morrow license and the status of Mr. Morrow's rights, so I didn't raise those arguments again. I was also under a bifurcation order that said those were supposed to be in a prior phase, and this was supposed to be the phase that didn't have anything to do with Mr. Morrow and his rights. And so I lost that argument because my motion did not dispose of the entire case, and that's how L&L ended up with a motion for summary judgment being granted in its favor. Now as I go through the claims, for the sake of organization and simplicity, I want to try to group them in three groups. Number one, I want to talk about the claims that the court refused to decide that it exercised its discretion on. Second, I want to talk about the claims that were dismissed based upon an erroneous finding that the Morrow license terminated in 1994, and if I have time after that, I want to talk about naked licensing and licensee estoppel. As for the claims that the court refused to decide, primarily when there was for declaratory judgment, both sides had extensive claims for declaratory judgment, in this case, relating to trademark ownership. L&L had a declaratory judgment action seeking a finding that they were the owner. My client had a declaratory judgment claim seeking a finding that they were the owner, also seeking, not only through Mr. Morrow, but based on their independent use. We also wanted a declaratory judgment that we had concurrent rights in the Outer Banks, and so we could at least use the mark in the Outer Banks while L&L may be able to use it in other places. The court refused to- Right, but are you getting the cart before the horse? Because if Judge Boyle was wrong about the Morrow agreement and the intent of the parties as to termination, then everything else kind of goes by the wayside, doesn't it? I agree, Your Honor. Would you like me to do that? I mean, I'm glad- Well, no, it just seems to me that that's the core, or the heart of your argument, and the declaratory judgment kind of follows in its wake. I guess, Your Honor, I would say that the core is the fact that the court refused to look at trademark ownership, and the Morrow license termination just gave the court an excuse to not deal with the ownership issues there, but let me just take the court's guidance and deal with those claims first. So the claims that were adjudicated based upon termination of the Morrow license, that was the claim for fraud against Beach Mart, that was the claim for trademark cancellation, which was based on fraud upon the trademark office, and claims for negligent misrepresentation. Now, we have demonstrated, and I'm not going to review all those today, I don't have time, and the court wouldn't want to be too, but we have listed literally dozens of fact disputes that underlie a determination of whether the Morrow license terminated. It's a very unique license, because if the license E.L.N.L. stopped paying royalties, there were two options that were given. Mr. Morrow's lawyer actually foresaw something like this happening, and gave Mr. Morrow two options. Under Section 8, it says he may terminate, and in such event, in other words, in the event he chooses to terminate, he sends a notice of termination. Also under Section 2C, he has the right to treat the agreement as royalty free. There are dozens, literally, of fact issues. The court implicitly decided those fact issues, although it didn't mention most of them, and didn't address most of them, but in order to find termination, necessarily had to somehow have resolved all of those fact issues in finding termination. In addition to all those fact issues, there's another issue that I'm afraid might have gotten lost in the briefing, because E.L.N.L. never mentioned it, and so I wanted to bring that to the court's attention, and that is conduct of E.L.N.L. that's inconsistent with this finding of termination. For example, there was a license with a party called Marco Destin that E.L.N.L. entered into in 1998. In that license, E.L.N.L. wrote, acknowledged that somebody else may own the Wings trademark, and I ask in depositions, who is that, and they said, Mr. Moro. So as of 1998, four or five years after this alleged termination, E.L.N.L., which now says the Moro agreement was irrelevant, there was nothing to it, it was over in a day, five years later, they're telling somebody Mr. Moro owns it. This case is not legally complicated, it's factually complicated. Judge Boyle saw a pure mix here. He saw it happen all the way back when you had Piedmont involved in it, and then somehow you get the president of the company buying the Wings logo, and then they let it lapse, and then you got agreements with Moro and other third parties in it, and there's some moving parts in this thing, but when you break it down to Judge Boyle's simplification of it, which is really what, if you want to try to hone in on to it, it really comes down to him saying that this 2005 Moro agreement had terminated, and therefore E.L.N.L. could make no misrepresentation, and that is a point that perhaps you ought to hammer on, because it doesn't matter if that agreement was terminated if, in fact, there was a misrepresentation. In other words, if it goes around saying we own this trademark infringement, and it didn't, that's not something that just ends because you don't have the agreement. It's simple little tight points there that can help to hone this case in where it needs to be. We can jump. You could spend days. It took days to go through these facts here. It took me years to develop this factor on it. Aside from the fact I've been on the outer banks, and I saw wings, and I never thought it was that complicated a big deal until I saw this case here. I didn't either. I mean, it's all over the place, and I know Judge Boyle, and you know Judge Boyle, and he's a bottom line guy. He got it from Judge Fox, who's very detailed on this thing, and it was a pure mess, and I guess he said, well, send it on. He did say, send it on up the fourth circuit and let them work it out. That is exactly what he said. He saw this mess, and he said, let them figure it out and give us some direction. He actually used basically those exact words. So I think to deal with it, it would be helpful to deal with those specific instances there that would give you cause to send it back for reconsideration or remand for the court to look at. We're not going to be able to resolve this case today. No one's going to leave this courtroom today saying, oh, this is all resolved. That is not going to happen today. One way or the other, unless it goes in the way he's gone here, that could happen, I guess. Your Honor, and we don't expect that. My client understands that. What my client wants and what I'm asking is simply a trial to resolve. As you've indicated, this is a horrendously complicated suspect. Speak to the no misrepresentation contention. He says that L&M made no material misrepresentation because the 2005 Morrow Agreement had terminated. Your Honor, I believe, to clarify a little bit, I believe his holding was it was because of the termination of the Morrow license rather than the termination of the 2005 agreement. So he was talking, Judge Boyle was talking about the 1994 agreement. It was entered into in 1993, and he said it was terminated in 1994. He said the Morrow Agreement terminated before the 2005 agreement. Your Honor, what's important about the Morrow Agreement is not how long it lasted or how long it was in place. Now, I believe that it's still in effect today. The royalty-free provision is what Mr. Morrow elected, but that doesn't matter. What's important about the Morrow license is merely the fact that it was entered into. The reason is this. Under the merger rule, you can't be both the owner of a trademark and a licensee of a trademark. They're two different things. An owner controls everything about the trademark. A licensee just has a right to use it. When a trademark owner and a licensee entered into a license agreement, the merger rule says that their rights merge together. So the trademark owner under that would be Morrow. He was the licensor. So he now owns the trademark, and he gets... But see, these are the questions that Judge Boyle did not get to. He did not... Because he terminated, he ended it before it got to deal with that kind of disposition you're saying. We don't know. That's if the Morrow agreement was valid, then the question is whether L&M is recognized as a subordinate in there. Those are questions he did not get to. So what happens, Your Honor, when the rights merge, Mr. Morrow gets all of the rights he had before and all of the rights that L&L had. He is now the trademark owner. L&L is the licensee that has the right to use all of those marks and all those rights, and that use of Mr. Morrow inerts to the benefit of Morrow. So when L&L uses as the licensee, it inerts to the benefit of Mr. Morrow. Here's why that's important. Under that merger rule, L&L ceased to be the owner of the Wings trademark, and Mr. Morrow became the owner. That's important because the misrepresentations that are the basis for our claims were L&L's claim that it owned the trademark, and that use could be traced back to the early 1970s when they began to use it. Now, my client has use of Wings beginning in 1994. So when L&L comes to my client and says, you have to sign this agreement, I give you permission to use Wings. Because if you don't sign it, I've been using it since the 70s. It's my trademark. I'm going to sue you, and I'm going to stop you. That made sense. My client signed it. The true fact, Your Honor, is L&L had no claim back to the 70s. Their claim started sometime after whenever the Morrow license terminated. If we just want to say for the sake of argument that the Morrow license terminated in 1994, and L&L at some point thereafter began using Wings in a way that they could claim national trademark rights. We have no record of when that is. But whenever it is, they could theoretically become the trademark owner again. But it becomes a fight between somebody who started using the trademark in 94 and somebody who used it whenever L&L did, 94, 95, 96, whenever it terminated. The point is, Your Honor, if the Morrow agreement, as long as it was a valid agreement, regardless of whether it terminated, it ended L&L's trademark rights. Therefore, L&L had no way to make these representations. So when L&L went to the trademark office and told the trademark office, we've been using this mark since the 1970s, and we don't even know this Morrow guy. We don't think he's using it anymore. Those were material misrepresentations. If the trademark office had known the truth, which is that L&L was not an owner but a licensee of Mr. Morrow, and that their actual trademark use that they could use to claim a registration didn't begin in some time after that registration, after that license with Mr. Morrow expired, and if the trademark office had known my client started using Wings in 1994, then there'd be a totally different situation. The trademark office basically would have had to decide who has priority, which is what we're asking the court to decide in this case, because my client was using the trademark in 1994, and L&L was using it, I think, as a licensee. But whatever, you've got to decide the priority. Your Honor, the answer to your question is a critically important question. The reason that the Morrow license matters is not whether it terminated, when it terminated. That's irrelevant. The fact that it was entered into is the pivotal fact, because that fact means that L&L could no longer claim trademark rights. That wasn't something Judge Boyle decided? No, Your Honor. Well, implicitly, I guess he had to reject what I just said, because what he found, he looked at the Morrow license as a magic bullet. If that went away, he assumed that all other claims would go away, and that's not the case. He was wrong to say that that agreement terminated. There were so many fact issues that couldn't be adjudicated, but even if he was right that it terminated, and even if L&L became the trademark owner, which is a whole other issue that Judge Boyle didn't deal with, but even if all that is the case, this is still a case for fraud, because it's not just that my client was told that L&L was the owner. My client was told L&L is the owner based on usage going back to the 1970s. The trademark office was told L&L was the owner based on usage going to the 1970s, and based on the Morrow license, that cannot be true. It cannot be true. At most, they could have theoretically assumed and gotten trademark ownership rights sometime after the Morrow license terminated. If that was in 94, then the earliest possible rights was 94. No way they could claim back to the 1970s. Okay, Mr. Burke. Thank you. Thank you, Judge. Let's hear from Mr. Taffet now. Good morning, Your Honors. May it please the Court. My name is Richard Taffet. I'm with the Morgan, Lewis & Bachius Firm, and I represent L&L, which has been talked about quite a bit today already. I'd like to start and comment that, indeed, Judge Boyle was able to narrow down these issues, and, indeed, we do agree with you, Judge Winn, that this case has been going on for a long time, and it's taken a lot of turns. He narrowed it down by saying, all I want to hear is a dispositive motion. First one of you guys come up here with one. You got a good shot of me granting it, because I'm going to punt it up to the full circuit. That's really what it came down to, isn't it? But he punted it up through the goal post, because he did it correctly, and because as Judge Keenan identifies, he did focus on the dispositive issue. Which is? Which is, was the Morrow agreement ever, was it terminated? He didn't need to reach the issue of whether it was valid in the first instance. Well, but key as to whether it was terminated was the intent of the parties. That's right. And was there an intent when these Gunderson letters were written of non-payment of royalty? Was the intent to terminate the agreement, or was it intent to continue royalty-free? And Judge Boyle doesn't deal with that, does he? Well, he does, in the sense that he refers to paragraph 8 of the agreement itself. That's appendix 355 it starts at. Right, but isn't that a disputed issue of fact? How can that not be disputed? Well, absolutely not. If the plain language, and New York law controls this question, in contract construction you look at the plain language of the agreement. And if the agreement states, as it does in paragraph 8, that it gives the option to the licensor, here Morrow, to exercise his right to terminate. And to do that, he has to take certain steps. And the first step is to- Now you're- Let me try to understand this, because this is where you kind of- I thought we were going to talk about the no misrepresentation aspect. I'm sorry. The no misrepresentation. You're talking about the actual termination of it in terms of the notice. If you don't- If you make a demand for the payment and they don't pay, then it's ended. Correct. That's not New York law. New York requires a little bit more than that. You've got to say, you've got to specifically indicate, this is going to be terminated if you don't do it or something. It's got to be a little bit more than that. But it does. You can't just say, send me a check. And then when they don't send the check, after the 15 days or so, it's over. If the contract says, and all due respect, Judge Winn, if the contract says that if they don't pay, if they don't send that check within 15 days, the contract shall terminate. And that's the exact language in this agreement in section 8. Then New York law interprets the plain language of this document. Now, Beachmark comes up with some explanations to try to refute that. But all they say is, well, the letters weren't delivered to the right address. Well, New York law doesn't require that. Right. Because section 2C says that in the event that the agreement has not been earlier terminated- Correct. Ten years from now, it shall become royalty free. Okay? Right. So the question is whether it had been terminated. And that second Gunderson letter says, it's in your client's best interest to pay the balance due as soon as possible. Well, but the- Well, how is that an unambiguous assertion of intent to terminate the agreement? It didn't need to say we're going to terminate. There is no magic language that is necessary in the notice letters, Your Honor. So you're saying that a licensor has to be manifesting an intent to terminate the agreement by asking for an overdue payment. You're saying necessarily. No, I'm saying under the specific express language of section 8, the licensor was permitted to take certain steps. And it says that in such event, and the event there is referring to the failure by L&L to make a royalty payment, in such event, licensor, that's Morrow, shall deliver written notice of such nonpayment and allow L&L to pay within 15 days. And then it says, if the royalty payment is not made during the cure period, that 15 days, then this agreement shall terminate, period. And therefore, what the letters, the importance of the letters, Your Honor, is that they expressly stated that you owe us for the past due royalties. And there were two letters, as we know. Moreover, Mr. Morrow testified that those letters were intended to say that you owe us this money. And Mr. Gunderson's second letter, which is appendix 378, I believe, said, it's in your client's best interest to have that payment made. And it's plain as day, at least in our position, that section 8 says that in the event of these occurrences, then there is a termination. And if I may switch to the question, Judge Wynn, that you raised with regard to the fraud issue and whether there's fraud. On that one, I was looking at the Geo case. We own the same case, the Geo case from the Second Circuit on the New York law, on the notice aspect of it. Well, that's one of the cases, yes. I'm just not reading that case the way you wrote it. Well, you know, there's also the... Because the district court went in your way and the Second Circuit went the other way. Yeah. It wasn't sufficient. Because, for a very, very critical reason, which is not this case. The critical reason there was because the party receiving the notice was prejudiced. And here, L&L, who is the recipient of the notice, is not claiming any prejudice. And if we look underneath the policy of those cases, it's really, can you cause there to be a detrimental effect on the party receiving it because the notice is defective? And here, nobody on L&L's side is claiming the notice was defective at all. So that case is just not applicable in these circumstances. And the better case is the Suarez case, which we cite from the appellate division of New York State Court. Okay. But what about the fact that the first Gunderson letter not only says you're overdue, but also includes an application to register the wings mark as a service mark? So there's some ambiguity there, isn't it? In terms of suggesting we're terminating the agreement, if you're saying, okay, we need your application to continue the agreement as well as your payment? The only ambiguity, Your Honor, would be is that Mr. Gunderson, at the time, who didn't have any recollection, the record doesn't indicate his understanding of what he meant by that language, is that presumably L&L would have cured. But they didn't cure. And that gave rise to the second letter in August, where the language was a little bit more stark. And it said, you're still overdue, pay us. And it's in your interest to pay us. Right. And they still had outstanding from their first letter a request for more information regarding your application to register the wings mark based on L&L's usage. And the record is clear that there was never a response to anything. Right. So isn't that an ambiguity regarding the intent of the parties? How can Judge Boyle simply have defined from that that there was no disputed fact as to whether there was an intent to continue the relationship? Because the intent here has to be an objectively manifested intent. That is black letter law. And whether there was a subjective intent by Mr. Morrow or his lawyer or anybody else is absolutely irrelevant for purposes of this contract issue. Well, they have to give a notice of termination, don't they? No, they don't. A notice of non-payment. Correct. And that's the big difference. And automatically... Right. And I guess, and I keep cutting you off and I apologize. My problem is, if they are accompanying the notice of termination with a notice of, we need your further information to continue this application process. They're clearly not saying non-payment, or maybe they're not. How can that be simply undisputed? Because it's not relevant, Your Honor, in the sense that they gave that notice in June and they added in the additional language. Nothing happened. The record's absolutely undisputed. L&L never responded. They followed up with another letter in August, which is past the cure period. Nothing ever happened after that also. So whether Mr. Morrow wished that L&L would have done something else, or if his lawyer asked for them to do something else, it doesn't matter. Because that may be their subjective intent. But they agreed to the precise language in this letter. And as the record indicates, there were other terms negotiated, which never got into this final contract. But the contract is unambiguous. It says, if the payment isn't made within the cure period, the contract, quote, shall terminate. So Morrow's intent is irrelevant, you're saying? Correct. As a matter of law, it is irrelevant. But it doesn't matter whether it terminated or not in determining whether L&L misrepresented the fact. And if it went around saying, we're the owner of an unregistered trademark of wings, that is, at the time of the 2005 agreement, you still, it doesn't matter if it's terminated. I would agree with that if there were facts which could establish the basis for a fraud or negligent misrepresentation claim. So the fact of the matter, it is undisputed, counsel conceded, that L&L has been using the wings mark since 1978, more than 40 years. It's undisputed that it represented, it was the owner of this trademark in 2005, and in fact it wasn't? And it knew that it wasn't, it knew that Morrow was, because it entered into a license saying that. No, it didn't, Your Honor, because as the record makes clear, that the understanding of the L&L wings people, and even signing the Morrow agreement, was that L&L owned the rights with respect to retail stores. If we look at the Morrow agreement, the only representations are made that he had five registrations, all for the use in connection with clothing. Second point I would make, and I alluded to it earlier, is that Judge Boyle didn't reach this question, he didn't need to reach this question, but the record is replete with undisputed evidence that the way that Morrow got these five registrations did not give him any rights. The Morrow agreement was void ab initio, from the outset, because he obtained these registrations as a matter of law, as a gross, through a gross assignment. And there is the nub of this situation, as to what you think is a matter of law, is undisputed, and what the opposing party says is disputed. Well, I would So it comes down that there is evidence to support the other side to any degree, it becomes disputed. To that much we agree, right? In that hypothetical, I would agree with that judgment, but I would assert that there is no disputed evidence, and that would be There is no disputed evidence as to LNL's intent in this case? Correct. Correct. Even if, let's look at the merger doctrine right now, which we would assert is totally misapplied by Beachmart's lawyer, and it is one of these ancillary or diversionary type of arguments that is being made. First of all, it doesn't apply to the type of situation we're arguing now. We don't have Morrow, who after 1994 conceded, he did absolutely nothing until Beachmart's counsel approached him, offered him money, and he said, sure, I'll get back involved. He did absolutely nothing between 1994 There's a lot more in this case, and a lot of deal with third parties. I mean, you've got this angling agreement where LNM comes up and they say, we'll set licenses for We'll get to that in a moment. That's not the merger doctrine, but on the merger doctrine But there's some representation. No, because that came at a different time. But if I may just address the merger and why that really doesn't matter for fraud. The people who are talking here are not lawyers. They don't know what a merger doctrine is. They don't know what rights they gave up. There is undisputed testimony that what was being given up and what was being obtained was rights with respect to clothing and that LNL always kept its rights with respect to the retail store operations. Whether there is a legal doctrine, which we, as I mentioned, and we briefed, is misapplied here. How does that support that LNL knowingly misrepresented facts or even negligently misrepresented facts? How does that create the intent, as Judge Boyle correctly found, that did not exist to mislead? How does it create a fraud claim when the principal of Beachmart was a longtime employee? He claims he was a business partner of LNL dating back into the 1970s or 1980s, I should say. How can he say that he was misled? Especially when we get to the naked licensing and the estoppel issues, which I think, Judge Wynne, you were alluding to, all of the facts there, again, it's a misapplication of the law and the doctrine by Beachmart in this case because there, the licensing estoppel doctrine does apply. That's why I say that when we parse through all of the different distractions and the changes in theories that are being presented here, this is a pretty straightforward case in the sense, and Judge Boyle concededly, he didn't address every single issue that we raised. For example, he didn't address the issue of whether Morrow ever acquired rights, but we will... If he had worked through these facts, we wouldn't be here arguing these kind of cases here. I mean, even with the merger doctrine that you seem to be hanging your hat on here, if that agreement was valid, you say it was not, you still, I mean, the common law of rights still comes into play with WINGS in terms of the merger rule here. And it's when you get in that kind of nuance that what we're dealing with here, it can be simplified when you look at it and simply say in a conclusory way, as a matter of law, and it cannot be, and it's undisputed, but the problem in this case is getting into the record. And once you get into that record and see, well, there's some evidence in, what'd you do with that? How'd you handle this? I'm not... It's difficult to do that. I'm sorry. Go ahead. No, I apologize. No, no. And Judge Fox was saying your client was acting in bad faith by hiding the Morrow agreement. Well, and he punished us, so that's going to be the next part of our cross-appeal. So, I mean, there's a whole lot going on in this case. There is a whole lot, but that has nothing to do with the fact that, as Judge Boyle correctly observed, the Morrow agreement was much ado about nothing. It was a creation by Peach Mart's lawyers. I give them credit. It was creative. But at the end of the day, Morrow, and as the record, and we put forward in the record, and we do get into the facts and the details, that Morrow never obtained any rights. He didn't have any rights to assign. He didn't have any... The agreement was invalid to begin with. The agreement, by its own expressed terms, terminated in 1994. L&L Wings continued, unabated, to use the L&L, to use the Wings name from 1978 onward. It did not lose its rights as a merger under the merger doctrine, as we argued that, in our briefs, that's being misapplied here. It cannot form the basis of a fraud or negligent misrepresentation claim. I thought it was relevant to the merger doctrine. You blew me off on it. It says, no, it's stop on something else. The fact that L&M would represent itself as a sub-licensee, and come back and say, I own it. I thought that was relevant insofar as intent on the part of L&M, in terms of what it says it is, and would affect the merger doctrine. You said it doesn't. On the merger doctrine? Yeah. No, I don't think it applies to the merger doctrine. So it's not an evidence of its intent, in terms of how it represents itself, to say, we'll sub-licensee, in this vein, to somebody else, and come back here and represent we the owner of it. You don't think that's relevant, because you want us to compartmentalize it, which is where we're going. You want us to look at, well, what did L&M do here? What did it do here? What did it do? Don't look there. Look only just at this. I would urge the court to actually look at that sub-license agreement. The sub-license agreement did not even mention- Oh, you don't want us to look at it. You said it doesn't matter. Why look at it if you said it's not part of it? I said it could deal with intent. So why look at it if it doesn't deal with intent? Well, in all fairness, Your Honor, I said it wasn't relevant to the merger doctrine, but it can be looked at. And if we want to look at it for purposes of intent, it is absolutely clear that those sub-license agreements do not mention the moral agreement. It correctly says somebody else out there may have a registration, because at the time, the moral registrations had not yet been canceled. They had not yet been abandoned. So in some respects, L&L is absolutely forthright in those. So that's my point, is if one were to look at the record. Thank you, Your Honor. Okay. Thank you very much. On the issue of termination of the moral license, counsel for L&L, his favorite sentence is the last sentence, and you can understand why. The last section of Section 8 says, if the royalty payment is not made during the cure period, then this agreement shall terminate 15 days after the date of such notice. But you've got to read the sentences that come before that to give it context. The first sentence says that the license work may terminate, so it's an option. That's to make it consistent with Section 2C, which gives him another option. And then it says, in such event. And after that, it refers to such a nonpayment. Counsel for L&L has never given any construction of this agreement that gives any meaning to the word such. So it doesn't have to, because New York law doesn't require it. Doesn't require to give meaning to all the words? Yeah, all you got to do is just send a notice that says, you didn't pay, and if you don't pay in 15 days, it's over. Well, Your Honor, it's possible to have a contract that says that, I suppose. Is that New York law? That's not what this says. No. New York, like any other state, you look at the language of the contract and what the contract requires. There's no universal New York termination law that supersedes all contracts. You look at what the contract says. This contract says he may terminate in such event. In other words, that he elects to terminate, then you deal with these provisions. So you've got to look at his intent. He's got two options. Termination is only one of the options. Okay, Mr. Burke, I want to remind you that you're into the yellow light, and if you want to reserve your time to respond on the cross-appeal, you're eating into that time. Understood, Your Honor. I'm just going to deal with one other issue real quickly, and then I'll sit down and reserve at least a minute or two. The issue that I just want to do briefly is I want to make clear that the court is focused on and understands the importance of our request for a reassignment in this case. Oh, I think that's abundantly clear. Thank you, Your Honor. In that case, I'll reserve the rest of my time. Okay. Unless the other judges have a question in regard to that. Thank you, Your Honor. Thank you, sir. All right, Mr. Taffet, your cross-appeal. Yes, ma'am. Thank you again. Very briefly on the cross-appeal. There's really two issues that we have to face here, and to put that in context, there is no doubt that there was certain conduct in this case which Judge Fox found to be problematic, to say the least. And bad faith. And bad faith. Not just problematic. Absolutely. Absolutely, Your Honor. We came into the case right at that time and tried to address those issues, but in dealing with that conduct, that bad faith conduct, Judge Fox imposed two remedies, one of which is we're not asking for reversal in this instance, which is the monetary penalty. My client understands that it has to pay for what it did, and it will, but the question really becomes when you look at the preclusive remedy that Judge Fox imposed, that the discretion is much narrower because it does raise questions under the Seventh Amendment, and here, if we look at the Fourth Circuit precedent, Hapcock, for example, even project management, which is what Beachmark relies on primarily, and even more recently in February, this court decided the Rangarajan, I apologize for the pronunciation case, where there was findings of appropriate sanctions that were preclusive. But if we look at each of those cases, they involved repeated conduct through a long period of time that essentially denied the counterparty the ability to litigate. We don't have that here. It's really all about the fact he precluded you from coming to court on future injuries. That's correct. That's the bottom line of that. That's right. And the point is here that there was no prejudice that was experienced by Beachmark. They got their full discovery, and L&L's paying for it. I'm sorry. Right. I'm sorry. But Judge Fox found that L&L's corporate designee lied, did he not? That was as a basis for the sanction. Right. That's correct. And thereafter, Beachmark got more discovery, including of that witness. They took his deposition again. They got additional testimony from corporate representatives. We're not walking away. We can't walk away from the finding, Your Honor. But what we're saying is that there was no need for the preclusive remedy consistent with this court's precedent to impose the preclusive remedy because everything that was problematic at the time was addressed. And L&L then participated in the continuing discovery. L&L is standing up and is willing to pay for the amounts. And Beachmark really, at this point, can claim no prejudice because it was given all of the opportunity to not only undertake additional discovery, but also to change the entire theory of its case, as it did as a result of this. It may not have resulted in a successful refocusing, but it was able to undertake an entire redo of the case with L&L paying for that redo. They argue in the papers that while they incurred millions and millions of dollars of injury and expense, well, that's not what they asked for. That's not what Judge Boyle did in awarding the fees. They asked for some amount. We suggested it should be a lower amount, and Judge Boyle carefully looked at all the submissions and came out with the amount that they are due. How is this an abuse of discretion? I don't think you've really answered that yet. Right. So in the connection, and I would point out in the Williams v. Volkswagen case, they made clear that when the sanction is preclusive, as this one is, that the discretion that's afforded the district court is narrower than it would otherwise be. And then when we look at a long series of Fourth Circuit cases dealing with sanctions and preclusive orders, most recently the Rangarajan case in February, the type of conduct where preclusive sanctions have been upheld have involved a long series of unremitied conduct. And the preclusive, very severe sanction that Judge Fox imposed was necessary to enable the integrity of the process to go forward. And you're agreeing that Rule 37 allows this. You're just saying it was improper to do it in this case. That's correct, Your Honor, under the facts of that. Thank you very much. Thank you. Mr. Burr. Thank you, Judge. Counsel's first argument is that there is no prejudice to my client. When he argues that, he's looking at the facts prospectively only, and he's not looking at any of the preceding history. Yes, once I finally found the moral license through all of my own effort, through a massive undertaking and discovery, yes, I was able to amend my claims and I was able to assert those claims, and hopefully someday we'll get a trial on those claims arising from the moral license. But look at what my client lost. Judge Fox makes this clear in the order. In essence, what happened is my client wasted a year and a half of litigation effort. We wasted effort trying a case that was the wrong case. We wasted a year and a half trying a case that was based on the assumption that L&L owned the trademark only to find a document wherein writing they acknowledged that they don't own the trademark. All of the depositions that I did up to that point were largely worthless. I filed complete comprehensive sets of summary judgment motions, all worthless. Legal research, pleadings that were done during that time period, all superseded and worthless. All of that litigation effort was rendered largely worthless. How can you possibly say that my client did not suffer prejudice by the fact that the defendant withheld the moral license? And yes, sanctions are permitted, but not for future conduct. It doesn't allow the judge to then sanction. You can go ahead on and continue to injure, and now they can't come against you. Can a judge do that? No, but, Your Honor, the judge can award a sanction for the injury that has been caused by the discovery abuse. Yes, but for future injuries that can arise from whatever is going on, something that's not proper, can he tell you, well, you can go ahead and continue on to harm you now, you can't get any benefit from that anymore. No, and Your Honor, I'm not claiming any prejudice in the future after that. I mean, I agree that it was ultimately cured, and I'm not claiming that they did anything wrong after the date of the sanctions order. The damage that was done to my client was all of the misconduct that took place before that. Everything that they did to my client to hide the existence of this in agreement. Judge Fox- So just to make a statement to say any notion of Judge Fox's order prohibiting that from happening, we reverse that. You don't have a problem with that then, right? I do not believe Judge Fox was prohibiting conduct in the future. Now, clearly, he stated some opinions. He thought there were a lot of abuses that went on the discovery- I said any notion that you can interpret it that he was doing it, we reverse that. It's not going to happen. If there is such an interpretation, we'll say that's not the case. It only occurred things before. In terms of the damage that was being remedied, it was the damage that occurred up to that point. You're saying Judge Fox was ruling on the case before him- Yes. Based on the existing claims. Based on the existing claims and the facts that existed at that point. Yes, Your Honor. Right. Not that he- and you agree that they certainly for future misconduct as Judge Wynn was asking you? Yes, Your Honor. I agree with that. The argument was made that there was no need for the preclusive remedy here and that the compensation that was provided would have been sufficient. If you look at Judge Fox's order, it's a very comprehensive, very thorough order. He thought about this in detail and he explained why he did the monetary compensation and why he imposed the preclusive remedy. On the money, what he said is I'm going to award Beachmark the costs that were incurred to find the evidence that L&L withheld. Basically, that involved things like the deposition that I had to take to find the document. That was something that could be compensated, that could be calculated, and he awarded that amount of money. There was no intent from the court. In fact, it would have been impractical for the court to even try to put a dollar amount on all of the loss that we suffered, for example, drafting summary judgment motions that weren't based on the evidence that we did, taking depositions that we did. You're way into the red now, Mr. Burke. I apologize, Your Honor. No, that's okay. I read the clock wrong. It's not like the clocks that I'm used to reading. I apologize. Your clock's red don't mean stop. I'm teasing you. I won't belabor it. I'm used to big numbers and that's it. Okay, just remember when you get to a traffic light, red means stop. Thank you, Your Honor. Yes. Thank you. The court will come down to Greek Council and the clerk will adjourn court. This honorable court stands adjourned until this afternoon at 2.30. Godspeed to the United States and this honorable court. Thank you.
judges: Barbara Milano Keenan, James A. Wynn Jr., Henry F. Floyd